# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Century BP, LLC,

                        Plaintiff,

v.

LakePointe Holdings II, LLC, World Fuel
Services, Inc., and William Elliott,

                        Defendants.

LakePointe Holdings II, LLC and World Fuel
Services, Inc.,

Counterclaim and Third-Party Claim Plaintiffs,

v.

Century BP, LLC, Emad Abed, and Faisal
Dahdal,

      Counterclaim and Third-Party Defendants.

Civ. No. 12-2142 (RHK/JJG)
**MEMORANDUM OPINION
AND ORDER**

---

Scott Matthew Cody, Tarshish Cody, PLC, Richfield, Minnesota, for Plaintiff and
Counterclaim Defendants.

Christopher J. Heinze, Kirsten J. Libby, Libby Law Office, P.A., Saint Paul, Minnesota,
for Defendants and Counterclaim Plaintiffs.

---

## INTRODUCTION

     Plaintiff Century BP, LLC ("Century") entered into agreements with Defendant

Lakepointe Holdings II, LLC ("Lakepointe") and World Fuel Services, Inc. ("World

Fuel") to lease and operate two gas stations in the Twin Cities—Lakepointe would supply

the stations and equipment and World Fuel would supply BP-branded fuel.  After various

obstacles arose in opening and operating the gas stations, which had been shuttered for several years previously, Century closed the stations and was eventually evicted from the premises.  It commenced the instant action alleging Defendants Lakepointe, World Fuel, and both companies' President, William Elliott, breached their agreements with Century, among other claims.  Lakepointe and World Fuel counterclaimed for breach of contract against Century and its owners, Emad Abed and Faisal Dahdal.  Defendants now move for summary judgment on all claims and counterclaims, and Century, Abed, and Dahdal cross-move for partial summary judgment.  For the reasons explained below, the Court will grant Defendants' Motion in part and deny Century, Abed, and Dahdal's Motion.

## BACKGROUND

In the fall of 2011, Abed and Dahdal created Century to operate gas stations in the Twin Cities.  They decided on two BP-branded properties located at 2825 Coon Rapids Boulevard ("Coon Rapids Station") and 2545 Division Street ("Division Station"), both of which were owned by Lakepointe.  They entered into negotiations with Elliott, Richard Bonneau (employed by Lakepointe), and Colleen Mercil (employed by World Fuel).

During negotiations, Bonneau represented that customers could use Roundy's Rewards Cards[1] at the stations to obtain a discount on fuel purchases, which would increase business and profitability.  (Bonneau Dep. at 32–33 (acknowledging using the Roundy's Rewards program as a selling point).)  Century alleges Elliott represented that

---

[1] Roundy's operates Rainbow Foods stores and offers a Rewards Program in which customers earn Rewards Points each time they buy groceries, which can then be used at participating BP gas stations for discounts and other perks.

the Roundy's program would remain in effect for at least a year.  Century also alleges

that Lakepointe represented that the stations would be "operable."  At first, Abed and

Dahdal interpreted this to mean that they could open the stations and start doing business

right away.  However, after visiting the stations in December and January, which Abed

described as "busted-up, filthy, [and] disgusting," they knew they would need some

cosmetic work before they could be opened.  (Abed Dep. at 104; Dahdal Dep. at 104–06.)

Century alleges it relied on these representations in deciding to lease the properties.

On December 12, 2011, Century and Lakepointe executed a Letter of Intent,

stating that Century would lease the two stations and equipment from Lakepointe and

Lakepointe would waive the first two moths of rent at both stations.  Century alleges this

two-month grace period was to allow it to get the stations running and earn an initial

profit rent-free.  On January 18, 2012, after further negotiation and inspection, Century

(represented by counsel) entered into the following agreements ("the Agreements"):

(1) to lease the stations from Lakepointe (collectively the "Station Leases"), specifically

to lease the Coon Rapids Station beginning January 18, 2012, with the first rent payment

due April 1, 2012, and to lease the Division Station beginning March 1, 2012, with the

first rent payment due May 1, 2012, each for a term of three years with an option to

purchase; (2) to lease equipment at the stations from Lakepointe (collectively, the

"Equipment Leases"); and (3) to purchase BP-branded fuel for both stations from World

Fuel (collectively, the "Fuel Supply Agreements").  In addition to Century's agreements,

Abed and Dahdal executed personal guarantees with Lakepointe and World Fuel,

agreeing to perform Century's contractual obligations in the event of its default.

Century also executed an electronic funds transfer ("EFT") authorization, allowing
Lakepointe to automatically debit Century's rent from a designated account when it came
due. (First Heinze Aff. Ex. M.)  Although the authorization does not mention either the
Coon Rapids Station or Division Station but rather Century's "contractual obligations"
generally (id.), Century was under the impression that the authorization was only for
payments on the Coon Rapids Station and it would set up a separate account and
authorization for the Division Station.  Century's payments to World Fuel functioned
somewhat differently.  Although the record is not completely clear, it seems World Fuel
would deliver gas to Century, the customers' credit card payments at the pump were
directed to a World Fuel account, and every two weeks, World Fuel would invoice
Century for any outstanding balance and debit that balance from a Century's account by
EFT or charge it against a $15,000 letter of credit Century provided.

  After signing the Agreements, Century took control of the Coon Rapids Station
and realized there was more work to be done than it expected.  First, although an initial
inspection of the underground fuel tank indicated it was in working condition, water
seeped in after Century filled it with fuel and it had to pump out the damaged fuel and
repair the tank.  Century contacted Elliott and Elliott approved its choice of vendor for
the repair.  Although the Maintenance and Repair Rider to the Equipment Lease states
that Lakepointe would pay for the fuel tank, it refused.  It also refused Century's
reimbursement request for the value of the damaged fuel ($2,000).

  Second, the station was not connected to the BP payment network and therefore
could not process credit card payments.  Although Elliott and Mercil were aware that the

station was not connected to the payment network at the time and that connecting it could take several weeks, no one had communicated this to Century.  Under the terms of its Fuel Supply Agreement, Century was required to use BP's payment network (and no other network), so Mercil contacted BP around February 8 asking it to connect the Coon Rapids Station.  She was advised it would take two to three weeks, if all went smoothly— but of course, it did not.  A "comedy of errors" ensued (Elliott Dep. at 79) and the Coon Rapids Station was not connected and able to process credit cards until approximately March 26—more than two months after Century's lease began and just a week before its first rent payment was due.

Third, and finally, Century discovered that it could not participate in the Roundy's Rewards program as (allegedly) promised.  Roundy's and BP controlled the program, not Lakepointe or World Fuel.  According to Mercil, the stations were equipped for the program but only Roundy's could decide which stations to enroll.  She and Bonneau deny promising Century would be part of the program and the program is not mentioned in any of Century's agreements.

Century alleges Lakepointe and World Fuel misrepresented the condition of the stations and the payment systems and it maintains the stations were inoperable.  Because of its trouble opening the stations, Century felt it had not received the benefit of its bargain and requested that Elliott modify the Leases to give Century two additional rent-free months in which to earn a profit.  It also requested that Elliott pay for the fuel tank repairs and the lost fuel.  Mercil negotiated some compensation from BP for the delays in

setting up the payment network and issued Century a $1,200 fuel credit.  But Elliott

otherwise refused to modify the Leases or reimburse Century.

Century ultimately opened the Coon Rapids Station for business beginning April 1

and Lakepointe successfully drafted Century's Equipment and Station rent for April from

its account.  However, at least two of World Fuel's attempted EFTs in April were

returned for insufficient funds and when Lakepointe attempted EFTs for the rent due May

1 on the Coon Rapids Station and the Division Station, they also bounced.  Although

Century had told Lakepointe not to debit the Division Station rents from that account,

Mercil viewed this merely as a "request" and continued to do so anyway.  (Mercil Dep. at

82–83.)

On May 15, when Century requested more fuel, Mercil texted Abed, "Bill [Elliott]

is no[t] releasing gas until the rent and lease payment is paid/deposited."  (First Cody Aff.

Ex. L.)  Abed protested and emailed Elliott directly, who then agreed to deliver the fuel.

But on June 4, when Century requested more fuel, World Fuel again refused.  Elliott

testified that he spoke to BP and decided to deliver fuel up to Century's line of credit and

after that, only for cash upon delivery.  But Abed's text messages with Mercil tell a

different story.  She told him Century had $4,500 left of unused credit but when Abed

requested $4,500 worth of fuel, she responded, "No."  (First Cody Aff. Ex. N.)  He then

offered to pay for the fuel out-of-pocket and she denied him again.  (Id.)  After a chain of

furious emails from Abed, Elliott told him that he would only release fuel upon payment.

(Id. Ex. M.)

Soon after, Century shut down the Coon Rapids Station and never opened the Division Station.  On July 30, 2012, Lakepointe commenced eviction proceedings against Century and it was evicted from both properties.  In August 2012, Century commenced the instant action alleging breach of contract against Lakepointe and World Fuel (Counts I-IV), conversion against Lakepointe (Count V), and tortious interference with contract against Elliott (Count VI).  Lakepointe and World Fuel counterclaimed against Century and Abed and Dahdal for breach of contract and breach of personal guarantees.  Defendants now move for summary judgment on all claims and counterclaims; Century, Abed, and Dahdal jointly move for summary judgment on Counts III, IV and VI[2] (Century's claims against Elliott and World Fuel) and Counterclaims III and IV (World Fuel's claims against Century, Abed, and Dahdal).

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.

---

[2] Although Century's Motion only mentions "Plaintiff's Counts III and IV," it argues in its Memorandum that it is entitled to summary judgment on Count VI as well.  As Defendant's responsive Memorandum likewise addresses Count VI, the Court will construe the Motion as seeking summary judgment (as to liability) on Counts III, IV, *and VI.*

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078–79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified.  When considering Century, Abed, and Dahdal's Motion, the Court views the record in the light most favorable to Defendants, and when considering Defendants' Motion, the Court views the record in the light most favorable to Century, Abed, and Dahdal.  "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact."  Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir. 2011) (per curiam).

## ANALYSIS

### I.    Century's Claims

#### A.  Breach of Contract

Century asserts four claims for breach of contract:  two against Lakepointe based on its alleged promises during lease negotiations and two against World Fuel based on Century's difficulties with the BP payment system and fuel deliveries.

*i. Lakepointe's Alleged Breaches*

Century claims Lakepointe promised to provide it with (1) "operable" gas stations and (2) stations where customers could use Roundy's Rewards Cards. It further alleges it relied on these promises in deciding to lease the stations and they were "incorporated as [] material term[s]" of the Station Leases. As Century could not operate the stations immediately upon taking possession and neither station was enrolled in the Roundy's Rewards program, it claims Lakepointe was in breach of the parties' agreements.

In response, Lakepointe notes that the Station Leases do *not* mention either operability or Roundy's Rewards, so the alleged promises were—at best—verbal agreements. And Minnesota's Statute of Frauds bars actions based on verbal agreements relating to the lease of land for more than one year. See Minn. Stat. §§ 513.01, .05.[3] Century does not challenge whether the alleged agreements fall within the ambit of the Statute of Frauds, but instead argues Lakepointe should be estopped from using the Statute as a defense.[4]

"The doctrine of equitable estoppel may limit the application of the statute of frauds. . . . [T]he legislature enacted the statute of frauds to promote honesty and fair dealings. 'When an application of the [statute of frauds] will protect, rather than prevent, a fraud, equity requires that the doctrine of equitable estoppel be applied.'" Roers v. Pierce, No. A08-0391, 2009 WL 67061, at *6 (Minn. Ct. App. Jan. 13, 2009) (quoting

---

[3] In a diversity case such as this, state law governs, and the parties agree that Minnesota law applies. See Gylten v. Swalboski, 246 F.3d 1139, 1141 (8th Cir. 2001).

[4] As the parties seem to agree that the Statute of Frauds applies absent an exception such as equitable estoppel, the Court restricts its analysis accordingly.

Lunning v. Land O'Lakes, 303 N.W.2d 452, 457 (Minn. 1980)) (internal citation omitted). Century, as the party asserting estoppel, must show that Lakepointe knowingly misrepresented or concealed a material fact with the intent to induce reliance, and that it relied on the misrepresentation to its detriment. See Brekke v. THM Biomedical, Inc., 683 N.W.2d 771, 777 (Minn. 2004). Century's estoppel argument fails on both claims, as its alleged reliance on Lakepointe's representations was unreasonable as a matter of law.

First, Century alleges Lakepointe promised "two operable gas stations at which Century could immediately conduct business during each location's initial rent-free start-up period." (Compl. ¶ 108.) However, Abed and Dahdal knew the stations had been shuttered for several years and visited both stations *multiple times* before entering into the Station Leases. Abed described the stations' condition, as he observed it during his visits, as "busted-up, filthy, [and] disgusting." (Abed Dep. at 104.) He and Dahdal knew the stations would need work before they could be opened and operated. (Id.; Dahdal Dep. at 104–06.) As Century was on notice of the true condition of the properties before leasing them and has not alleged that Lakepointe promised to clean up or renovate the stations prior to the leases, its purported reliance on Lakepointe's assurance that they would be immediately operable was unreasonable. See Corazalla v. Quie, 478 N.W.2d 197, 198 (Minn. 1991) (reliance by purchaser on seller's representation that lake was "private" was unreasonable where he had twice inspected the property and could observe a fence indicating otherwise and public records likewise disclosed it was not private).[5]

---

[5] To the extent Century claims the premises were inoperable because the payment-processing systems were not set up, its dispute is with World Fuel, not Lakepointe, and that claim is

Second, Century alleges Lakepointe promised "to provide Century with premises where customers would be able to use Roundy's Rewards Cards." (Compl. ¶ 101.)  As an initial matter, this alleged misrepresentation was not regarding a *material* fact.  A material provision in a contract relates to one of its primary purposes.  Reuter v. Jax Ltd., 711 F.3d 918, 921 (8th Cir. 2013) (applying Minnesota law).  The primary purpose of Century's Station Leases was to obtain premises for operating gas stations; not to ensure potential customers could use grocery-store discount cards when paying for fuel.

But even if it were a material misrepresentation, Century's reliance was unreasonable as a matter of law because *Roundy's* controls its rewards program, not Lakepointe.  Lakepointe provided Century with stations capable of processing Roundy's Rewards Cards; thus, it complied with its promise to the greatest extent possible.  But it was unreasonable for Century to rely on Elliott's (alleged) statement that "the Roundy's program would remain in effect for at least one year" (Compl. ¶ 12), as he was promising something outside his control.  This should have been apparent to Century, as there is no evidence or allegation that Elliott represented he had any authority over the program or any affiliation with Roundy's.  See Gresser v. Hotzler, 604 N.W.2d 379, 386 (Minn. Ct. App. 2000) (plaintiff's alleged reliance on defendants' realtor's representations was unreasonable as real estate agents have no implied authority to contract on behalf of their principals and there was no evidence of apparent authority).

discussed below.

As Century has failed to allege the breach of any *enforceable* term of its agreements with Lakepointe, its breach-of-contract claims (Counts I and II) will be dismissed.

ii. *World Fuel's Alleged Breaches*

Century alleges World Fuel breached the Fuel Supply Agreement by failing to provide it with functional payment-processing systems and by discontinuing fuel deliveries. Unlike its claims against Lakepointe, both these claims are (purportedly) based upon written terms in the Fuel Supply Agreement.[6]

First, Century alleges that World Fuel "had an obligation under the Supply Agreement to provide Century with functional electronic point-of-sale ['EPOS'] payment processing systems" and failed to do so. It argues the Fuel Supply Agreement required Century to have an EPOS system connected to the BP payment network and the "attendant obligation to provide Century [] with that network connection fell upon [World Fuel]." (Pl.'s Mem. in Supp. at 18.) In support, it cites Elliott's and Mercil's deposition testimony acknowledging that World Fuel coordinated the installation of the payment system for the Coon Rapids Station. (Id.) But Century fails to cite any language from the Fuel Supply Agreement requiring World Fuel to install the EPOS system as it alleges.

In fact, Century *never* specifies the provision of the Agreement it alleges World Fuel breached. And this is because the Agreement puts the onus of equipping the stations

---

[6] The Court notes, however, that *neither* party has provided citations to any of the provisions at issue in the 48-page Fuel Supply Agreements. Accordingly, the Court's analysis is based on its own review of the Agreements.

on *Century*, not World Fuel.  The Agreement states:  "Dealer [Century] . . . will equip, or cause to equip, all of its Approved Retail Sites with electronic point-of-sale ('EPOS') equipment approved by BP for processing transactions on BP's Payment Methods network and will install BP's most current software and firmware."  (Compl. Ex. G., Electronic Point of Sale (EPOS) Contract at 1.)  As Century has not identified the source of World Fuel's alleged contractual obligation and the Court cannot locate any, its breach-of-contract claim fails as a matter of law.

Century also alleges World Fuel breached the Fuel Supply Agreement by "discontinu[ing] its fuel supplies on or about June 4, 2012, without justification or the required ninety days' notice."   (Compl. ¶ 124.)  The parties dispute whether World Fuel discontinued its fuel deliveries or merely discontinued Century's credit and demanded cash on delivery instead.  Ultimately this dispute is irrelevant because Century acknowledges that two of World Fuel's attempted EFTs for fuel in April 2012 were dishonored (Abed Dep. at 68–70; Dahdal Dep. at 62-64) and, under the terms of the Agreement, "[m]ore than 1 incident of failure by [Century], within a 12 month period, to make payment according to [World Fuel]'s EFT policy causing a draft to be dishonored for nonsufficient or uncollected funds . . . entitles [World Fuel] to suspend deliveries, impose other payment or prepay terms, and/or terminate or nonrenew this Agreement." (Compl. Ex. G, Dealer Supply Agreement § 6(a).)  Thus, after Century's second dishonored payment, World Fuel was entitled to either suspend fuel deliveries or change the terms of payment.  So even assuming it discontinued or suspended fuel deliveries on June 4, 2012, as Century alleges, it did not breach the Agreement by doing so.

Accordingly, these breach-of-contract claims (Counts III & IV) will also be dismissed.

### B.      Conversion

Century claims Lakepointe converted its funds by making unauthorized withdrawals from Century's bank account.  Specifically, it claims it "established a bank account to cover property and equipment rent solely for the *Coon Rapids* Property" and "Lakepointe withdrew money from the Coon Rapids Property's bank account to pay itself for amounts allegedly owed on the *Division* Property."  (Compl. ¶¶ 129, 131 (emphases added).)  To prevail on this claim, Century must show Lakepointe committed "an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use or possession." DLH, Inc. v. Russ, 566 N.W.2d 60, 71 (Minn. 1997) (internal quotation omitted).

Lakepointe acknowledges withdrawing money from Century's account for rent owed under the Division Station Lease, but it maintains Century consented to those withdrawals by executing the EFT Authorization.  Century contends it only authorized withdrawals pursuant to the *Coon Rapids* Leases but this argument is not supported by the terms of the EFT Authorization, which allowed Lakepointe "access to the [designated] bank account in order to electronically draft or deposit funds in accordance with [the parties'] contractual obligations."  (First Heinze Aff. Ex. M.)  As the Division Leases were "contractual obligations" between the parties, Lakepointe was authorized to draft funds from Century's bank account for the Division rent.

In response, Century argues it withdrew any alleged authorization when Abed told Mercil not to use the bank account for rents due on the Division Station.  (Mercil Dep. at 79-80.)  But under the terms of the Authorization, Abed agreed to provide ten days' written notice to Lakepointe prior to revoking it (id.) and he failed to do so.  Thus, his attempted revocation was ineffective and Lakepointe was acting according to Century's authorization when it made the disputed withdrawals.

### C.      Tortious Interference with Contract

Finally, Century claims Elliott tortiously interfered with its contract with World Fuel by intentionally procuring World Fuel's breach of the Fuel Supply Agreement in retaliation for Century's nonpayment of rent to Lakepointe.  As the Court has already determined World Fuel did *not* breach the Agreement as alleged—an essential element of tortious interference—it need not address this claim further.  See Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982).

## II.      Lakepointe's Claims

Lakepointe asserts claims for breach of contract against Century for its failure to pay rent and against Abed and Dahdal for breach of their guaranty agreements.

It is undisputed that Century was required to pay Lakepointe rent on the Station and Equipment Leases monthly and beginning May 1, 2012, it failed to do so.  In its defense, Century argues its failure to pay rent was justified by Lakepointe's alleged prior breaches of the Agreements.  But the Court has already dispensed with Century's breach-of-contract claims against Lakepointe, and Lakepointe's alleged breaches would not have excused its nonperformance regardless.  See Murphy Oil USA, Inc. v. Brooks Hauser,

820 F. Supp. 437, 442–43 (D. Minn. 1993) (Kyle, J.) (gas station lessor's alleged breach of contract did not excuse lessee from paying rent) ("[The tenant's] remedy when faced with [the lessor's] breach of the contract, assuming some degree of performance, was either rescission, a suit for damages or mutual modification through a re-negotiation of the contract.").  Furthermore, Century's obligation (and failure) to pay rent under the Coon Rapids Station Lease was already adjudicated in the Anoka County District Court eviction proceedings.  See Cole v. Paulson, 380 N.W.2d 215, 218 (Minn. Ct. App. 1986) (explaining collateral estoppel effect of an unlawful detainer action).  As Century's failure to pay rent was a material breach of the Lease Agreements and it "has failed to come forward with any specific facts or legal arguments which would support a legally cognizable defense to the admitted failure to make full payments under the Lease[s]," Lakepointe is entitled to summary judgment on its breach-of-contract claim.  Murphy Oil, 820 F. Supp. at 443.[7]

Lakepointe also asserts a claim against Abed and Dahdal for breaching their personal guarantees to Lakepointe.  Each guaranteed the "prompt payment and performance of all obligations of [Century]" under the Leases.  (Compl. Exs. C–F.)  They further promised, in the event of Century's default, to "immediately perform all obligations of [Century] under the Lease, including, but not limited to, paying all amounts due under the Lease."  (Id.)  And finally, they promised to "pay to [Lakepointe] all expenses **INCLUDING ATTORNEYS' FEES** incurred by [Lakepointe] in enforcing

---

[7] As Lakepointe has not specified (or proved) its alleged damages in this Motion, the Court will grant summary judgment as to liability only and leave open the the issue of damages (and Lakepointe's alleged failure to mitigate them).

[Lakepointe's] rights against [them] or [Century]." (Id.)  As neither Abed nor Dahdal has paid Lakepointe, it claims they are in breach of their guarantees.  Abed and Dahdal have not defended this claim.  Based on the terms of the guarantees and the Court's determination that Century breached its agreements, the Court concludes that Abed and Dahdal are jointly and severally liable for any amounts Century owes Lakepointe under the Lease Agreements *and* for Lakepointe's reasonable attorney's fees and expenses incurred in collecting those amounts.  (See id. ("each of you agrees that your liability is joint and several" and promising to "pay to [Lakepointe] all expenses **INCLUDING ATTORNEYS' FEES** incurred by [Lakepointe] in enforcing [Lakepointe's] rights against [them] or [Century]").)

## III.    World Fuel's Claims

World Fuel also asserts a breach-of-contract claim against Century and seeks to hold Abed and Dahdal liable under their personal guarantees of Century's performance. It alleges Century "owes money to World Fuel[] for petroleum products that were purchased by Century and resold to the general public."  (Def.'s Mem. in Supp. at 29.) But it has not proved this allegation or any damages at all.  In support of the claim, World Fuel cites only an email from Abed to Elliott in which Abed continues to dispute charges from World Fuel but offers to pay World Fuel $1,757.39 from its letter of credit.  The email does not specify (let alone concede) what Century owes for fuel or other services, and as World Fuel has offered no other evidence, the Court cannot determine as a matter of law what—if any—damages World Fuel suffered.   Nor has it specified any liquidated damages to which it is entitled under the Fuel Supply Agreements.  As damages are

- 17 -

essential to a breach-of-contract claim, <u>Jensen v. Duluth Area YMCA</u>, 688 N.W.2d 574, 579 (Minn. Ct. App. 2004), World Fuel is not entitled to summary judgment.  Likewise, World Fuel has not proved its claim against Abed and Dahdal for breach of their personal guarantees.  As it is unclear whether World Fuel was damaged and if so in what amount, the Court will deny Century, Abed, and Dahdal's Motion for Summary Judgment on these counterclaims also.

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 25) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) the Motion is **GRANTED** as to all Counts of Century's Complaint (Doc. No. 1 Ex. 1) and the Complaint is **DISMISSED WITH PREJUDICE**;

(2) the Motion is also **GRANTED** as to Defendants' counterclaims Counts I and II; and

(3) in all other respects, the Motion is **DENIED**.

**IT IS FURTHER ORDERED** that Century, Abed, and Dahdal's Motion for Summary Judgment (Doc. No. 16) is **DENIED**.

Date:  March 31, 2014

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

- 18 -